# Paull *against* Mackey.

In an action of ejectment, it is not competent to give evidence of the parol declarations of the plaintiff, that he had abandoned a title which he had acquired under a deed.

A witness is incompetent when the effect of his testimony may be to preserve a fund for the payment of a debt due to himself.

A certificate by a third person of the amount of a debt due by him to the defendant, is not admissible in evidence to affect the plaintiff's rights. The debts must be proved by the usual evidence of their existence.

ERROR to the common pleas of *Fayette* county.

James Paull, the plaintiff in error, was plaintiff below, and brought an ejectment against Stephen Mackey and others, to recover a tract of land containing two hundred and fourteen and a quarter acres, situated in German township, Fayette county, and called "Cold Spring." On the 8th of December 1821, William Paull was the owner of the tract in dispute. By an agreement then made between him and James, James granted, bargained and sold to William all his title to St John's Furnace, and the lands appurtenant thereto, estimated at eight hundred acres; also the "Trevor Ore Bank" and "Bullock Pen" tracts, in consideration of which William agreed to reconvey to James the tract for which this ejectment was brought

(theretofore sold by James to William by article of agreement dated December 19th, 1818), the conveyance to be made immediately, with a warranty against any incumbrance done or made by him, and was to pay to James the amount, principal and interest, which James was bound to pay for the Bullock Pen tracts; also to pay, in addition, to James the sum of 2000 dollars, in payments. When all the payments are made by William, James was to execute conveyances for the furnace and tracts. On the same day William executed a deed to James for the Cold Spring tract, in consideration of 4000 dollars, acknowledged and recorded on the same day, to wit, the 8th of December 1821.

On the 15th of December 1821 (one week afterwards), William Paull entered into a covenant or agreement with Stephen Mackey, one of the defendants, (which was not sealed and delivered till the 28th of October 1822) reciting that " whereas the said William Paull and Basil Brownfield had some time ago entered into partnership in the iron business, and which partnership had become indebted to the said Stephen in the sum of 1000 dollars, for which they had given their notes, twenty in number, and each for 50 dollars, which are now held by the said Stephen; and whereas the said William and Basil had since dissolved partnership, and since the dissolution, William, some time during the fall of 1821, entered into another contract with the said Stephen for the purchase of his agricultural produce, grain, hay and meat, at stated prices, the whole to be delivered on the plantations of Stephen, as well that on which he lived, as that of which he had received the possession on the 1st of April last from the said William, to be held by Stephen as security for the payment to him of the debt due to him from the said William and Basil, and which, at the time of the contract before recited, it was agreed by them Stephen should hold for such length of time as the debts of Paull and Brownfield, and of William Paull alone, then contracted, or thereafter to be contracted with said Stephen, should remain due and unsatisfied, without any rent being demanded therefor by said William, or any interest on said debts demandable by said Stephen, or until the said Mackey should have paid to said Paull the full price in trade as aforesaid, such price to be ascertained by themselves, or in case of their disagreement, by three men indifferently chosen by them." The article then goes on to state, that Stephen was then in possession of the tract by his tenants, and had kept the agreement on his part—" Now therefore know ye, that I the said William Paull, in performance of the agreement aforesaid, and the better to effectuate the true meaning and intent of the parties, have this day granted, &c. unto said Stephen, all that tract of land, &c. (the " Cold Spring" tract), of which Stephen has at present possession as aforesaid, to have and to hold, &c.; provided, nevertheless, that the estate hereby granted, or intended to be granted, to the said Stephen shall, at the end of any one year, counting from the 1st of April last, become null and void upon full settlement and payment of the mo-

neys which may be found due to the said Stephen by the said William, for or on account of the debts of the said Paull and Brownfield, or of the contract of the said Paull with the said Stephen, as above; or shall at any time become vested and indefeasible in the said Stephen, his heirs and assigns, upon his paying to Paull, in manner as aforesaid, the full price of said plantation, as may be agreed upon by them, or if they should disagree thereon, by three men indifferently chosen by them."

On the 30th of March 1822 (four months after), a written agreement was made between the plaintiff James Paull, Jun. and the defendant Stephen Mackey. This agreement recites, that " whereas the said Mackey had entered into an agreement with William Paull, whereby the said William placed said Stephen in possession of a certain tract of land in German township, which possession said Stephen retains to this day by his tenant Samuel Hixon, which tract by said agreement was to be held by said Stephen until a certain debt, then incurred by said William Paull and Basil Brownfield, should be paid by said William Paull ; and whereas afterwards it was agreed by said William Paull and Mackey, that said Stephen should deliver to said William all the grain which said Stephen should raise and have to spare off said plantation, as well as the tract of land whereon he lives, and also what meat the said Stephen might have to spare, at certain prices stipulated between them; and that the said William would permit and suffer the said Stephen to retain the possession of said tract of land in German township, until as well the debt aforesaid, as the product of said farm so to be delivered by said Stephen to said William, at the rate stipulated between them, should be fully satisfied and paid by the said William in produce of the farm aforesaid ; the value of the said farm in German township thereafter to be ascertained by them, as the said Stephen now represents : and whereas the said James Paull, as he represents, being ignorant of the said agreement, entered into a contract with the said William for the exchange and purchase of the said tract, and with the expectation that he should obtain the possession thereof on the 1st day of April next, without dispute by said Stephen or any other person, hath entered into a written agreement, whereby he has leased said farm to Abraham Campbell for the term of five years from the 1st of April next, and feels himself bound to have the said lease carried into effect with the said Campbell. It is therefore agreed, by and between said James Paull and said Stephen Mackey, as well to avoid any disappointment to said Campbell as any law-suit which might arise or grow out of the said transaction between them, that said Stephen shall accept and receive said Campbell as tenant of said tract, and shall cause him to be put into the free and undisturbed possession thereof on the 1st day of April next. That said Campbell shall be permitted, during the term of five years aforesaid, to use, occupy and enjoy the same, without any molestation from the said Stephen, or any person claiming under him.

[Paull v. Mackey.]

" It is further agreed, that said James will secure to said Stephen the faithful performance and fulfilment by said Campbell of every thing stipulated by the said Campbell, to be done and performed by the said Campbell as tenant of the said plantation under the aforesaid James Paull, all which will more fully appear by reference to the lease by said James Paull to said Campbell, now deposited with John Lyon, Esq. to be copied.

" It is further understood and agreed between the said parties, that the expense necessary for the new roofing of the old barn when removed, and all repairs of a permanent nature, which are expressly imposed on said James Paull by his lease to said Campbell, are to be incurred and borne by said Stephen, who shall have every right and discretion as to procuring materials, which the said James Paull might or could exercise.

" It is further agreed, that the said James Paull shall superintend and enforce the performance of the covenants on the part of the said Campbell, and shall duly pay over or cause to be paid over to said Stephen, according to the terms of the lease to the said Campbell, the rents of said plantation.

" And it is further understood, &c. that said Stephen will not interfere with, or take any proceeding against said Campbell for or on account of the rents of said plantation, until after default by said Campbell in refusing to answer the order of said James Paull.

" And said James Paull doth hereby relinquish any right to the said plantation, so far as the same might affect any right in law or equity which the said Stephen may have derived, or shall derive hereafter, under the contracts aforesaid by him made with said William Paull. And the said James Paull doth further agree that he will not take any step to enforce the notice which has been given to said Stephen to quit possession of the tract."

The lease above referred to, was dated the 15th of December 1821. In the beginning of the summer of 1821, the partnership between William Paull and Basil Brownfield was dissolved. William Paull went on with the iron business until the beginning of summer 1822, when he stopped business. He was absent in the spring of 1823. In June 1823 he applied for the benefit of the insolvent laws, returning St John's Furnace and lands as his property.

The defence was : 1. That there had been a settlement on the 25th of November 1822, between Mackey and William Paull, signed by William Paull, of all accounts, say debts and sureties, giving a balance of 3000 dollars due Mackey, which he was to have a credit for on account of the farm purchased of William Paull. The admission of this certificate in evidence formed the subject of the plaintiff's second bill of exceptions.

2. An agreement between them, dated the 28th of May 1823, by which William Paull agreed to fix the price of the farm called Cold Spring, which he sold to Stephen Mackey some time ago, at 2500 dollars; and said Mackey also agreed thereto. The admission of

III.—P

[Paull v. Mackey.]

this testimony was excepted to by the plaintiff in the third bill of exceptions.

The Cold Spring farm, it appeared by the evidence, would rent for from 100 to 200 dollars per annum, clear of taxes and repairs.

It was given in evidence by Basil Brownfield, that the defendant Mackey obtained possession of the Cold Spring tract in the spring of 1821, under a verbal contract with William Paull, who was then in partnership with Brownfield. Mackey had the obligations of the partnership for 1000 dollars, but Brownfield said they had not received more than half that amount.

The defendant further relied on the acts and declarations of James Paull, showing that the land was relinquished by him after his deed from William Paull, and their contract rescinded: and produced witnesses who proved that on a trial in the case of the Commonwealth for use *v.* Lynch, sheriff, and sureties, on the 2d of November 1825, James Paull was a witness and stated that an arrangement had taken place between William Paull and himself, that he should convey St John's Furnace to William and receive Cold Spring in exchange, but that that bargain had been rescinded; that William Paull had no interest in St John's Furnace property; that he, James Paull, had no interest whatever in the Cold Spring tract; something about the manner in which William Paull and Mackey had cheated him out of the Cold Spring tract; that he found William Paull had sold the land to Mackey, and that he then made arrangements with Mackey to receive Campbell as Mackey's tenant, and gave up all his right to Mackey if he had any. To prove these declarations William Nixon was produced by the defendant as a witness, whose admission constituted the fourth bill of exceptions taken by the plaintiff.

The defendant then gave in evidence the deposition of John B. Trevor to prove the assignment, without date, of a judgment entered on the 30th of September 1819 in the common pleas of Fayette county in the suit of Molly Bunton for use against William Paull, Thompson M'Kean and James Paull, which was transferred to the deponent by John M. Austin, Esq. the attorney of Molly Bunton, at the request of James Paull, Jun., under the idea entertained and expressed by James Paull to the deponent, that it would be a lien upon the Cold Spring tract, then in the possession of Mackey. The admission of this testimony was the subject of the fifth bill of exceptions taken by the plaintiff.

The defendant then gave in evidence a *fieri facias* issued in the above case to March term 1823, with directions to levy on the tract in dispute as the property of William Paull, in the occupancy of Campbell. For the admission of this testimony a sixth bill of exceptions was taken; and a seventh was taken to the admission of a *scire facias* issued on the above judgment for the use of John B. Trevor, to June term 1825, which was tried, and, on the evidence under the plea of payment, verdict was rendered for the defendants.

The defendants then gave in evidence the record of a suit, James

[Paull v. Mackey.]

Paull, Jun. *v.* Steele and Doughty, in which a declaration in cove-
nant was filed on the 14th of March 1825, which set forth an article
of agreement, dated the 5th of February 1824, by which James Paull
agreed to convey to C. M. Doughty and James Steele, St John's
Furnace and the lands appurtenant thereto, estimated at eight hun-
dred acres; also the "Bullock Pen" and "Trevor Ore Bank" tracts,
in all one thousand seven hundred acres, for which the said Doughty
and Steele were to pay two hundred and sixty-seven tons of pig
metal in payments; said Paull to convey with general warranty
against all the world except the commonwealth. An exception was
sealed at the instance of the plaintiff's counsel, to the admission of
this testimony.

The plaintiff's counsel requested the court to instruct the jury:

" 1. That the article of agreement between James Paull, Jun. and
Stephen Mackey, dated the 30th of March 1822, has no other effect
than to postpone the right of James Paull, Jun. until Stephen Mackey
was satisfied out of the rents and profits for the amount he had then
advanced to William Paull, and the amount for which he may before
that time have been liable on account of William Paull.

" 2. That after the conveyance of the land to James Paull, Jun.
by William Paull, and the deed recorded, and notice to Mackey,
James Paull, Jun. stood in the shoes of William Paull, and all sub-
sequent payments, if any, ought to be made to James Paull, Jun.

" 3. That if the jury believe Stephen Mackey has at this time re-
ceived out of the rents and profits a sum sufficient to cover all his
advances to William Paull, he cannot any longer hold the land
against James Paull, Jun.

" 4. The court is also requested to instruct the jury that the plain-
tiff's title to the land in controversy being made out clearly by the
conveyances read, cannot be divested by supposed loose declarations,
the import of which might be misapprehended by the witnesses."

The court below (Baird, president) charged the jury as follows:

" The plaintiff has deduced apparently a regular title by a chain
of conveyances from the commonwealth down. The last link is a
deed from William Paull, dated the 8th of December 1821, and the
effect and operation of this deed form the prominent controversy in
the case. The defendant claims that prior to the date of this deed
he had acquired a right to the land in question under a contract with
William Paull, and that in pursuance of it he had been put in pos-
session in the spring of 1821. This he has attempted to prove by
the testimony of Basil Brownfield. The agreement between William
Paull and Stephen Mackey was reduced to writing, and executed
the 28th of October 1822. But if this paper was the commencement
of his title, it could [not] affect the plaintiff's title if otherwise good.
He further alleges that James Paull, Jun. had rescinded or abandoned
his claim under the deed of the 8th of December 1821, upon which
he now relies. ' The plaintiff's title to the land in controversy being
made out clearly by the conveyances read, cannot be divested by

[Paull v. Mackey.]

supposed loose declarations, the import of which might be misapprehended by the witnesses.' But if the acts and deliberate expressions of James Paull, Jun. (as proved by William Nixon and Brownfield) have satisfied you fully that he and William Paull had rescinded the title conveyed by the deed of the 8th of December 1821, and that each party was restored to the situation he was in prior to the contract which was consummated by that deed, then your verdict ought to be for the defendants.

"I have referred to the testimony of the declarations of James Paull on this point. His acts are also in evidence; and particularly an agreement between him and Stephen Mackey, dated the 30th of March 1822. We are asked by plaintiff's counsel to say to you, that this agreement 'has no other effect than to postpone the right of James Paull, Jun. until Stephen Mackey was satisfied out of the rents and profits, the amount he had then advanced to William Paull, and the amount for which he may before that time have been liable on account of William Paull.' If there was nothing else in the case, I might possibly doubt whether this might not be the true construction. But connected with the testimony as to the declarations of James Paull, I am inclined to give a different interpretation, and a different effect to this instrument. I will not therefore say that it must be restricted to the operation contended for. Several other acts of James Paull are in evidence.

"We are further requested to say, 'that after the conveyance of the land to James Paull, Jun. by William Paull, and the deed recorded, and notice to Mackey, James Paull, Jun. stood in the shoes of William Paull, and all subsequent payments, if any, ought to be made to James Paull, Jun.' This would be true if James Paull had not rescinded the title he had acquired by the deed of the 8th of December 1821, and if Mackey had nothing more than a mortgage or security on the land and the possession until he was paid his debt. But if Mackey had a prior right to the land itself (by contract, payment of money and delivery of possession), or if James Paull had relinquished his title, the case would be otherwise. In either of these alternatives James Paull would have no right to recover. This in effect answers the third point of plaintiff's counsel, which is, 'That if the jury believe Stephen Mackey has at this time received out of the rents and profits a sum sufficient to cover all his advances to William Paull, he cannot any longer hold the land against James Paull, Jun.' If Mackey had but a mortgage (as we have said) and James Paull had a subsisting title in fee, then Mackey, if he has received his money ought to yield the land, and the plaintiff in that case could recover. But if Mackey had the prior right to the land, by an absolute purchase and payment of the consideration money, or if James Paull had abandoned his title, by agreement with William Paull, the plaintiff cannot recover. Or whether Mackey had title or not, if you believe James Paull had rescinded the contract

[Paúll v. Mackey.]

with William Paull under which he claims, he cannot recover.  He can only recover by showing a subsisting title in himself."

Errors.

1.  The court below erred in admitting the several items of evidence offered by defendants, to which bills of exceptions are taken respectively.

2.  The court erred in admitting William Nixon to give testimony in chief.  First, because he was interested in the event of the suit. Second, because his testimony was irrelevant and improper.

3.  The court erred in instructing the jury that " the effect and operation of the deed of the 8th of December 1821, by William Paull to James Paull, Jun. formed the prominent controversy in the case.

4.  The court below evaded direct and explicit answers to the several points submitted by plaintiff's counsel, and gave to the jury no certain rule by which to be guided in making up their verdict.

5.  The court erred in telling the jury that " the acts and deliberate expressions of James Paull (as proved by William Nixon and Brownfield) were sufficient to prove that he and William Paull had rescinded the title conveyed by the deed of the 8th of December 1821, and that each party was restored to the situation he was in prior to the contract which was consummated by that deed; and that if they were fully satisfied on this point, their verdict ought to be for the defendant."

6.  The court erred in the answer given to the first point of plaintiff's counsel upon the construction of the article of the 30th of March 1822, between James Paull, Jun. and Stephen Mackey, and in saying that the " true construction," " interpretation" and " effect" of that instrument is to be determined by subsequent declarations of James Paull, Jun., which had no connexion with that article.

7.  The court erred in the answer given to the second point of plaintiff's counsel, in assuming what belonged only to the jury to decide—that the title of James Paull, Jun., under the deed of the 8th of December 1821, had been rescinded by him; and also in intimating to the jury that Mackey's right was not a mortgage right, but a title in fee, and that if so, plaintiff would have no right to recover.

8.  The court below also erred in the answer given to the third point of plaintiff's counsel, by assuming and intimating an opinion, that Mackey's right was more than a mortgage right, and that " he had a prior right to the land, by an absolute purchase and payment of the consideration money," when there was no evidence to that effect; when it was not even pretended or alleged by defendants that such were the facts; and when the testimony given went to show directly the reverse.

9.  The whole charge is equivocal, and calculated to mislead the jury on questions of fact and of law.

10.  The court below erred in the answers given to all the points of plaintiff's counsel, generally; in all the opinions intimated; and in the view taken of the entire case.

[Paull v. Mackey.]

*Ewing*, for plaintiff in error.

The main errors in this case were committed in the construction given to the articles of agreement between James Paull and Stephen Mackey of the 30th of March 1822, and in the admission of a mass of parol evidence and other testimony entirely irrelevant.

The second bill of exceptions relates to the receipt or certificate of William Paull's indebtedness in the sum of 3000 dollars to Mackey, dated the 25th of November 1822. On the 30th of March 1822, when the agreement between James and Mackey was made, the latter had actual notice of James's title. But the deed from William to James, dated the 8th of December 1821, was notice of James's title to all the world: and from this latter date any payments made by Mackey could not affect James Paull. The instrument of writing, it is true, does not specify when the payments were respectively made. It lay, however, on the defendants to show the amount Mackey had paid prior to the commencement of James Paull's title. We could have no information as to payments except through the defendants.

The third bill of exceptions was taken to the admission in evidence of the agreement of the 28th of May 1823, between William Paull and Mackey, fixing the sum of 2500 dollars as the price of the tract. William, by his deed to James, had divested himself of all his right. He had no authority then to estimate the value of the land. This was a right which belonged exclusively to James. In June 1823 William applied for the benefit of the insolvent laws; and it was therefore on the eve of his insolvency that he fixed the price of the land.

Next we come to the fourth bill of exceptions, which was taken to the admission of William Nixon as a witness. (Here Mr Ewing read the witnesses *voir dire*.) He stated himself that he was interested; that he had a claim depending upon the contingency of the defendants' success in the cause. He was therefore not a competent witness. Where A promises B to pay a sum of money to C, C may sue. Youst et al. *v.* Martin, 3 *Serg. & Rawle* 427; Innis *v.* Miller, 2 *Dall.* 50; M'Vaugh *v.* Goods, 1 *Dall.* 62; Boyer *v.* Kendall's Administrator, 14 *Serg. & Rawle* 178; Long *v.* Bailie, 4 *Serg. & Rawle* 222. Nixon was a creditor of the firm of Paull and Brownfield, and Mackey, after satisfying the Hardin claim, was to pay the debts of the firm generally. Where an action is brought on a mortgage, which accompanied a bond, a subsequent mortgagee is not a competent witness for the defendant. Enters *v.* Peres's Executors, 2 *Rawle* 279. If a witness have an order for money payable out of the sum recovered in the suit, or if the suit is to create or increase a fund on which he has a claim, he is incompetent. 1 *Caines* 364; 2 *Pick.* 240.

We objected to the record of the suit and proceedings on the *scire facias* of Bunton for use *v.* Paull and others, because the whole was clearly irrelevant.

[Paull v. Mackey.]

The admission of the record of the suit instituted by James Paull against Doughty and Steele we also excepted to. The defendants did not show that diligent search had been made for the original agreement, nor did they prove that the copy was a true copy.

Again, as to the admission of Nixon. This testimony was not competent in itself even if the witness had been admissible. It is the well known policy of Pennsylvania that titles to real estate shall appear on record. We have a statute prohibiting the acquisition of titles by parol. It requires the same degree of solemnity to revoke, as to make a title. It is a dangerous principle to admit parol testimony, because its tendency is to dispense with the requirements of the law and to diminish the security of titles to real property. Possession and payment of the purchase money confers no lien on, or right to land. Money due on a mortgage cannot be discharged by an instrument of writing not under seal. How can parol proof be received to invalidate a deed? There can be no such thing as a parol mortgage. Bowers *v.* Oyster, 3 *Penns. Rep.* 239; Christine *v.* Whitehill, 16 *Serg. & Rawle* 107, 108, 109; Lessee of Church *v.* Church, 4 *Yeates* 280; Anderson et al. *v.* Nesbit et al., 2 *Rawle* 114. The title of Mackey from William Paull was worth nothing. Whatever title he may have is derived from James. And whether James surrendered all his rights is to be judged by the written instrument of the 30th of March 1822. But this is certain, that in three days after his purchase from William, he gave notice to Mackey, who was in possession, to quit. This is one of the circumstances going to show that what Nixon said was true, viz. that James complained William and Mackey had cheated him out of the land, or made him think he was cheated. The court below should have instructed the jury to disregard Nixon's testimony.

Next as to the errors in the charge of the court below. It evades the points submitted, "keeping the promise to our ear, but breaking it to our hope." The court were mistaken in saying that the deed from William to James Paull was the principal matter in controversy in the cause. What was said on this point, instead of being intelligible, must have been bewildering to the jury. Where the court used the expression, "if otherwise good," what could they have meant by it? We had a right to the opinion of the court on the law arising out of the agreement between James Paull and Mackey. Our request was not complied with. Was that agreement to be metamorphosed by subsequent declarations? The only part on the face of it which seems to affect the rights of James Paull is the conclusion. All, however, that was intended was to postpone his right until the rights of Mackey, under his agreement with William Paull, were satisfied. The charge of the court below erroneously assumes the fact that James had rescinded his contract with William; and refers the question of mortgage and Mackey's title to the jury. It was error not to decide the question directly, whether it was a mortgage

or an absolute title.　Powers et al. *v.* M'Ferran et al., 2 *Serg. & Rawle* 44, 47.

*Dawson,* for defendants in error.

The first parol agreement between William Paull and Mackey was prior to the date of the deed under which the plaintiff claims. Mackey had taken possession and made large advances under his agreement. Not a dollar was paid as the consideration of the deed to James Paull. The consideration was the St John's Furnace property. William and James were brothers, and played into each other's hand. Their transactions were strongly marked with an appearance of fraud. To show that the conveyance of the tract in dispute from William to James was a mere sham proceeding, we proved that shortly afterwards James sold the Furnace property, which he pretended to have conveyed to William, to Steele and Doughty. The testimony produced by us for this purpose was clearly admissible. It also showed that he revoked his contract with William.

*Forward,* on the same side.

The original agreement between William Paull and Mackey is recited, and ratified as true, in the agreement between James Paull and Mackey. The agreement of the 18th of December 1821 was for an exchange between William and James. The Furnace property was the consideration of the deed to James. The consideration was never paid. The Furnace has not been conveyed to William. On the contrary James continued to exercise ownership over it. A deed then was given on the one side, and the other party failed to perform his part of the contract, which was executory. Upon this failure the party giving the deed is reinstated in his rights, and a reconveyance to him is unnecessary. It could be rescinded by being cancelled, and each would hold as before : and the contract becoming rescinded, James would be the trustee of William. If James advanced no consideration, he cannot derive any benefit. Suppose the agreement first made between William and Mackey were a mortgage, the mortgagee would have a right to purchase, and to the possession, by paying the value of the land. Could William defeat his right, creditors being out of the question, fraud apart, and no purchasers in the way ? On the contrary could it not be enforced against William? As has been already stated, the agreement between William and Mackey is recited in that between James and Mackey, in which James expressly relinquishes all right to the land, in law or equity, to Mackey. Is not this saying to Mackey, "Go on and execute your contract with William, as the owner." Under this understanding William had a right to convey to Mackey, and Mackey a right to purchase on paying the value fixed by the parties. The recital in the agreement between James and Mackey shows that the agreement between William and Mackey must have been before

[Paull v. Mackey.]

them. Thus James treated Mackey's agreement with William as a purchase.

After the agreement between James and Mackey, might not the latter continue to make further advances? He had the land as a pledge. The owner may renounce in equity in favour of one who has been encouraged by him to go on and make payments or improvements. The agreement was evidence. Both had put a construction upon it : and James has treated the whole affair of his purchase from William as disannulled. Can James now come into court and treat the agreement between William and Mackey as a mortgage, and claim the land as his own, for which he has paid nothing? The declarations and acts of James that he had relinquished his right in favour of Mackey, were admissible as evidence. He allowed the rents to go to Mackey. The contract was *in fieri ;* and it matters not whether the tract was estimated at 2500 or 3000 dollars. As to the allegation of fraud, it all proceeds on the false supposition that James had performed his part of the contract with William. Towards him there could not be the fraud imputed. The case would be different if William's creditors were in his place. But to this suit there are no such parties. The value of the land had been paid, and there could be no remaining interest in William or in James. Nixon, we contend, was a competent witness. When first called, he supposed he had an interest; but when called a second time, he thought differently. 2 *Stark. Ev.* 747 ; 3 *Serg. & Rawle* 130. The charge of the court below was right, in viewing the deed from William to James as the principal matter in controversy, and as being susceptible of rescision. So it was treated by the parties themselves.

*Ewing,* in reply.

Suppose William Paull had paid 2000 dollars in hand, and failed to pay the rest of the consideration, and James recovered the land, how could Mackey hold? William carried on St John's Furnace till 1822. In June 1823 he surrendered the Furnace for the benefit of his creditors. It is not necessary in this ejectment to prove what, or whether any consideration was paid by James in acquiring his title. We rest upon the statute of frauds. The whole foundation of this controversy is the agreement between James and Mackey. Previous to March 1822, when it was made, James could at any time have turned Mackey out as mortgagee, who until then had not a particle or shadow of interest. The main question is as to the construction of that agreement.

The opinion of the Court was delivered by

SERGEANT, J.—The plaintiff has a deed dated the 8th of December 1821 from W. Paull. The defendant, Mackey, claims title under agreements with W. Paull before and after this deed, and a ratification thereof by the plaintiff. He also contends that the plain-

III.—Q

[Paull v. Mackey.]

tiff, subsequently to his deed, rescinded the contract with W. Paull under which the deed was executed, and thereby relinquished all claim to the tract.

It would seem that in the spring of 1821, while W. Paull was owner of this tract and carrying on the iron business at several works in partnership with Basil Brownfield, under the firm of Paull and Brownfield, this firm incurred a debt to the defendant, Mackey, by giving him twenty notes of 50 dollars each, and as a security for the payment W. Paull placed Mackey in possession of the Cold Spring tract, for which this ejectment is brought, under an agreement that he should hold it as security for the payment of said debt.   Of this money it is stated by Brownfield, a witness for defendant, that not more than half the amount was received by the firm.   Soon afterwards the firm was dissolved and W. Paull carried on the business. Another contract was made in the fall of 1821, between W. Paull and Mackey, which purports to have been reduced to writing on the 15th of December 1821, but was not executed till the 28th of October 1822, nearly a year after.   It recites the first contract and states the additional agreement to be, that W. Paull should buy of Mackey grain, meat and hay, to be raised on Mackey's farms, and that the tract should be held as security for these debts also; with the addition of a clause for a conditional purchase by Mackey, upon his paying to W. Paull in the mode above mentioned the full price of the plantation, to be agreed on by them, or in case of disagreement, by three men to be chosen by them.   The defendant contends that this event did occur: that the debts, &c. within the meaning of the contract equalled and exceeded the price of the farm, which W. Paull on the 28th of May 1823 agreed to fix at 2500 dollars.

This agreement between W. Paull and Mackey, dated the 15th of December 1821 but not executed till the 28th of October 1822, is an agreement for a mortgage, but also contains by the same clause a proviso for a purchase on the happening of a certain event.   This purchase however was still executory, to be consummated by future acts of the parties fixing the value or choosing arbitrators.   It might be a question whether it would be treated in equity as any thing else than a mortgage throughout.   But it seems to me clear that it is only he who has the title to the land, that on the one hand could redeem, or on the other hand fix the price or value of the farm for a sale.   It could not be that these rights should remain in W. Paull when he ceased to have a resulting interest in the land of any kind.   They belonged to the person that had the title to the land, who in this instance was the plaintiff, James Paull, Jun., unless he renounced them expressly and clearly, which he does not appear to have done.

What were the rights of the parties, however, under these agreements it is unnecessary to inquire, because the plaintiff is not bound by them further than he had agreed to ratify them.   They were made, so far as appears, without his knowledge or assent at the time, and derive their efficacy as to him only from his contract of the 30th

[Paull v. Mackey.]

of March 1822, by which alone his obligations and the rights of the defendant are to be determined. The circumstances that led to this contract were as follows.

On the 15th of December 1821, a week after his deed, the plaintiff had leased to one Campbell, for five years from the 1st of April ensuing, and covenanted to deliver possession. He also gave notice to Mackey to quit. Before the 1st of April, however, it appears the two parties became aware of the conflict likely to arise between them from the previous acts of W. Paull. J. Paull perceived that W. Paull had come under engagements to Mackey and placed him in possession, by which his own agreement with Campbell would be frustrated, and he be subjected to an action by Campbell for breach of covenant. To prevent this the agreement of the 30th of March 1822, between plaintiff and defendant, is made. It purports to recite the agreements between W. Paull and Mackey, *as represented* by Mackey; and *the representation* of the plaintiff as to his title and his ignorance and the difficulty he had got into with his tenant. I consider J. Paull, Jun. as bound by the agreements only as thus represented. It does not appear that the draft of the 15th of December 1821 was shown to him; nor does the language used warrant that supposition. On the contrary it is the *representation* of Mackey of the agreement that J. Paull is here bound by, and no more. And in this what relates to the conditional purchase clause is so incongruous and unintelligible, that it is impossible to give it any definite meaning. At the same time I am of opinion that, if recited clearly, the acts done by W. Paull afterwards, would not vary the rights of the parties, for the reasons I have already stated.

The true construction of the agreement of the 30th of March, and the clause of relinquishment by the plaintiff in its close, appears to be, that the plaintiff, in consideration of the defendant's agreeing to take Campbell as his tenant, agrees that Mackey should hold the land until, out of the rents and profits or otherwise, he was reimbursed clear of all just charges and expenses; in the first place, the debt due to him by the late firm of Paull and Brownfield, on all or any of the notes of hand to him given, and next the debt due to him by W. Paull for articles of agricultural produce of the kind mentioned, viz. grain and meat furnished to W. Paull either before or after the 30th of March 1822, while W. Paull carried on the iron works. And that whatever Mackey can prove to be due to him on these accounts must have been paid before he can be ousted from the possession. We are further of opinion that Mackey had no right to hold this tract against the plaintiff for the purpose of paying off the debts of Paull and Brownfield to other creditors of theirs, as it would seem is contended by Mackey and these creditors under some verbal agreement or understanding at some period or other amongst them. No such right is stipulated in the agreement of the 30th of March 1822, nor even in the sketch of the 15th of December 1821. It cannot be

tacked to the mortgage by parol, and is in no way binding on the plaintiff.

Having thus noticed the more material points of this case, I shall proceed to consider the rest under the various heads which present themselves in the record.

The first error relied on by the plaintiff in error, is that contained in the second bill of exceptions, the admission by the court in evidence of the certificate of William Paull, dated the 25th of November 1822, that he had that day settled with the defendant and found in all their accounts, say debts and sureties, a balance of 3000 dollars due him, which he is to have a credit for on account of the farm he had purchased of him. This certificate was certainly not evidence against the plaintiff in this suit. The debts due to Mackey must be shown by the usual evidence of their existence, not by the certificate of W. Paull, after he had ceased to do business. This certificate was further objectionable in purporting to authorize a credit for " sureties," a class not within the contract of the 30th of March 1822, and also in fixing a purchase as having taken place, when W. Paull had not, after the deed to plaintiff, any interest in the land, and had nothing to do with any purchase or sale of it. There was error therefore in receiving this certificate in evidence.

The next error assigned is in the third bill of exceptions to the agreement, dated the 28th of May 1823, between W. Paull and Mackey, by which W. Paull agrees to fix the price of the farm (which it states he sold to Mackey some time ago) at 2500 dollars, and Mackey on his part agrees to let the price be so fixed. This agreement was, for the reasons I have stated, of no validity whatever against the plaintiff. The right of fixing the price, and the right of making sale of the property, belonged to the plaintiff as the owner of it, after it had answered the purposes for which it was placed in the defendant's possession, namely the payment of debts : and W. Paull, in undertaking thus to dispose of it under the agreements between him and Mackey, acted without authority and could not bind the plaintiff. There was error therefore in receiving this evidence.

The fourth bill of exceptions is to the admission of William Nixon as a witness for the defendant. This witness declared on his *voir dire*, that he had a debt against Paull and Brownfield, which Mackey was to pay in case of his success. It was also proved by Brownfield that Mackey, in consideration of getting the Cold Spring tract, was to pay the debts of the firm of Paull and Brownfield : that this agreement was made in June 1821 or later, after the dissolution of the firm. Nixon further stated that Mackey never made any promise to him. It would seem therefore that Nixon, in giving evidence to promote the success of Mackey, was aiding to preserve a fund for the payment of his own debt, which fund he will lose if the plaintiff recovers. He has therefore a direct interest in the defendant's success in making out a title to this tract of land, since on that the payment

of his debt by Mackey depends.   There was error therefore in his admission to testify on behalf of the defendant.

The fifth, sixth and seventh bills of exceptions embrace evidence offered by the defendant and admitted by the court, to show acts and opinions and declarations of the plaintiff going to prove that he had rescinded his contract with William Paull, and abandoned the title acquired under his deed.   If a title by deed could be divested by proof of this kind, real estate would be held by a very loose tenure indeed.   Let it be supposed that a party having a complete title should think he has no right, and under this impression seek to strengthen it by acquiring additional muniments; or being mistaken in a question of law of difficult solution, should declare he had no title : would evidence of all this take away his title?   Unquestionably not: this evidence would leave things just where they were before : the written title remains.   It is to guard against such modes of settling questions of title to real estate that the act of assembly of 1772, for the prosecution of frauds and perjuries, expressly forbids parol grants, assignments, or surrenders of interests in land.   It was improper therefore to receive the evidence contained in the deposition of J. B. Trevor of the plaintiff's procuring an assignment of a judgment against William Paull, under the idea that it was a lien against his interest in the tract in dispute, with directions to levy on it.   So also the plaintiff's claiming the St John's Furnace was irrelevant to the question of his title to the Cold Spring land, under his deed.   He might really remain the owner of the St John's Furnace lands, &c. because William Paull had not complied with his contract; or he may since have acquired another title to it; or he might have mistaken his right in contracting to sell it.   Its introduction in this cause could only embarrass by leading into a trial of the plaintiff's title to St John's Furnace, a matter irrelevant to the issue trying ; or present a fact of doubtful complexion, from which the strongest inference that could be drawn would be that the plaintiff supposed he had a title to the Furnace lands, and contracted to sell them—an inference of no consequence in this suit.   I am therefore of opinion that the court erred in receiving the evidence objected to in the fifth, sixth and seventh bills of exceptions.

The eighth, ninth and tenth errors assigned are embraced in the former part of this opinion, and need not be again referred to.

Judgment reversed, and a *venire facias de novo* awarded.